**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**RBF TRUST LLC, a Florida company,**
**PAULO FERNANDO DE BASTOS,**
**JOAO PEDRO FONSECA,**
**a/k/a JOAO PEDRO FONSECA DE BASTOS,**
**RBF TRUST LLC, a Michigan company,**
**D3 GESTION IMMOBILIERE LLC,**
**a Florida company, and**
**D3 GESTION IMMOBILIERE LLC, a Michigan company,**

**Defendants.**
______________________________________/

# COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I. INTRODUCTION

1. This case concerns an international web of unregistered, fraudulent securities offerings that have raised at least $40 million from more than 250 investors.

2. At the center of this web are two half-brothers – namely, Paulo Fernando De Bastos, a Florida real estate agent, and Joao Pedro Fonseca (collectively, the "Individual Defendants").

3. From approximately April 2016 until early 2020 ("the relevant period"), De Bastos and Fonseca offered securities in the form of investment contracts. Specifically, De Bastos and Fonseca offered investments in a purported real estate enterprise, through companies they own and control, including two Florida-based companies, RBF Trust LLC ("RBF Florida") and D3 Gestion Immobiliere LLC ("D3 Florida"), and two Michigan-based companies, RBF Trust LLC ("RBF

Michigan") and D3 Gestion Immobiliere LLC ("D3 Michigan"). D3 Florida and D3 Michigan are collectively referred to as "D3 Gestion".

4. The Defendants' fraudulent offering operated through multiple layers of fraud and deceit. For example, the Defendants told investors that their funds would be used to acquire properties from the Defendants that were owned by the Defendants. In truth, however, in a majority of the transactions, the Defendants did not own the properties purportedly sold to investors.

5. Further, the Defendants told investors Defendants would repair and renovate the purchased properties, and then lease the properties to tenants in order to generate investment returns. In truth, the Defendants misappropriated the investor funds to line their own pockets.

6. Additionally, De Bastos touted his real estate experience to investors but failed to disclose: (a) that the Business Court of Paris had previously ordered the liquidation of De Bastos and Fonseca's French real estate company and prohibited them from managing companies or commercial activities for a period of 5 years after they, among other things, disposed of corporate property as their own, and (b) that the State of North Dakota had previously issued a cease-and-desist order against De Bastos alleging securities law violations in connection with a prior real estate scheme.

7. Through their conduct, the Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], and Section 10(b) and of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]. Defendants De Bastos and Fonseca also violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a) and 77e(c)], and De Bastos also violated Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

8.      Unless enjoined, the Defendants are reasonably likely to engage in future violations of the federal securities laws. Among other relief, the Commission seeks permanent injunctions, disgorgement, and civil penalties against each Defendant based on the violations alleged in this Complaint.

## II.  DEFENDANTS AND RELATED ENTITIES

### A.  Defendants

9.      **De Bastos** is a real estate agent licensed in Florida, and is a citizen of France.  De Bastos currently resides in Crestview, Florida and France.  During the relevant period, De Bastos worked out of his real estate offices in Plantation, Florida and Detroit, Michigan.  De Bastos was a manager, member, officer, or key executive with control over RBF Florida, RBF Michigan, D3 Florida, and D3 Michigan.  Defendant De Bastos goes by the name Paulo De Bastos and Paul De Bastos.  De Bastos has never been registered with the Commission.

10.     On June 16, 2015, the North Dakota Securities Department ordered De Bastos to cease-and-desist from, among other things, offering and selling unregistered securities, making material misrepresentations or omissions in connection therewith, and acting as an unregistered broker-dealer in North Dakota in connection with an unrelated real estate scheme. *In the Matter of Paul De Bastos*, N.D. Sec. Dep't, June 16, 2015.

11.     On March 26, 2014, the Business Court of Paris ordered the liquidation of De Bastos and Fonseca's French real estate company, La Maison des Locataires (SARL), and prohibited De Bastos and Fonseca from managing companies or commercial activities for a period of 5 years after they, among other things, disposed of corporate property as their own. *Paul De Bastos and Joao Pedro De Bastos Fonseca*, (Bus. Ct. of Paris Mar. 26, 2014).

12. **Fonseca** is a resident of France. From no later than May 2016 until at least September 2019, Fonseca was a manager, member, officer, or key executive with control over Defendant RBF Florida. Fonseca signed the purchase and sale documents and land contracts on behalf of the entities through which Defendants sold the properties to investors. Fonseca also uses the names Joao Pedro Fonseca De Bastos.

13. **D3 Florida** is a Florida limited liability company created in February 2019 with its principal place of business in Plantation, Florida. From no later than February 2019 until at least May 30, 2020, Defendant De Bastos owned, controlled or managed Defendant D3 Florida.

14. **D3 Michigan** is a Michigan limited liability company created in May 2016 with its principal place of business in Detroit, Michigan. From no later than May 2016 until at least May 2020, Defendant De Bastos owned, controlled or managed Defendant D3 Michigan.

15. **RBF Florida** is a Florida limited liability company created by De Bastos and Fonseca in June 2012, with its principal place of business in Plantation, Florida. De Bastos and Fonseca owned or controlled RBF Florida until May 2020, when it was administratively dissolved by the State of Florida.

16. In 2019, Defendant RBF Florida merged with ten other entities owned or controlled by De Bastos or Fonseca – namely Queshua Investments LLC (“Queshua”), Queshua Investments 2 LLC (“Queshua 2”), Queshua Investments 3 LLC (“Queshua 3”), Pre-USA LLC (“Pre-USA”), Protective LLC (“Protective”), Mariana Trench LLC (“Mariana Trench”), Patrimoine North America LLC (“Patrimoine”), Bishop Rock LLC (“Bishop Rock”), Vostok Investments LLC (“Vostok”), and Himalayan Investments LLC (“Himalayan”). In connection with Defendants’ investment scheme, De Bastos and Fonseca held out three of the entities, D3 Michigan, Pre-USA, and Protective, as a purported management company, a consulting company, and a homeowner’s

insurance company, respectively, and sold properties to investors through the remaining seven of these entities.

17. **RBF Michigan** is a Michigan limited liability company created in April 2018, with its principal place of business in Okemos, Michigan. Since February 2, 2021, RBF Michigan has not been in good standing, presumably for failing to file annual reports.

**B. Related Non-Party Entities**

18. **Bishop Rock** is a Michigan limited liability company created by Fonseca in July 2019, with its principal place of business in Detroit, Michigan. From no later than July 2019 until at least September 2019, De Bastos and Fonseca owned or controlled this company. De Bastos and Fonseca held Bishop Rock out as an owner and seller of properties located in the Detroit, Michigan area. Bishop Rock merged into RBF Florida in September 2019.

19. **D3 Asset Management LLC** ("D3 Asset") is a Florida limited liability company created by Fonseca in April 2018, with its principal place of business in Plantation, Florida. From no later than April 2018 until at least April 2019, De Bastos and Fonseca owned or controlled this company. De Bastos held D3 Asset out as a real estate management/consulting company.

20. **Guratiba Investments LLC** ("Guratiba") is a Michigan limited liability company created in August 2016, with its principal place of business in Okemos, Michigan. From no later than August 2016 until at least April 2019, De Bastos and a non-party owned or controlled this company. De Bastos held Guratiba out as a seller of real estate in the Detroit, Michigan area.

21. **Himalayan** is a Michigan limited liability company created in May 2018, with its principal place of business in Okemos, Michigan. From no later than May 2018 until at least May 2019, De Bastos and Fonseca owned or controlled this company. De Bastos and Fonseca held

Himalayan out as an owner and seller of properties located in the Detroit, Michigan area. Himalayan merged into RBF Florida in May 2019.

22.    **Mariana Trench** is a Florida limited liability company created by De Bastos in September 2018, with its principal place of business in Plantation, Florida.  From no later than September 2018 until at least May 2020, De Bastos and Fonseca owned or controlled this company.  De Bastos and Fonseca held Mariana Trench out as an owner and seller of properties located in the Detroit, Michigan area.

23.    **North Dakota Bakken Connection LLC** ("Bakken"), is a North Dakota limited liability company created in November 2012, with its principal place of business in Williston, North Dakota.  From no later than 2013 until at least February 2021, De Bastos owned or controlled this company.  De Bastos held Bakken out as a consulting company in North Dakota.

24.    **Patrimoine** is a Delaware limited liability company created in April 2017, with its registered office in Dover, Delaware.  From no later than April 2017 until at least September 2019, De Bastos and Fonseca owned or controlled this company.  De Bastos and Fonseca held Patrimoine out as an owner and seller of properties located in the Detroit, Michigan area.  Patrimoine merged into RBF Florida in September 2019.

25.    **Pre USA** is a Florida limited liability company created in October 2015, with its principal place of business in Plantation, Florida.  From at least August 2017 until at least May 2019, De Bastos and Fonseca owned or controlled this company.  De Bastos held Pre USA out as a real estate consulting or management company.

26.    **Protective** is a Delaware limited liability company created in February 2018, with its registered office in Dover, Delaware.  From at least February 2018 until at least January 2020,

De Bastos owned or controlled this company.  De Bastos held Protective out as a homeowner's insurance company to investors.

27.     **Queshua** is a Florida limited liability company created by Fonseca in September 2016, with its principal place of business in Plantation, Florida.  From no later than September 2016 until at least May 2019, De Bastos and Fonseca owned or controlled this company.  De Bastos and Fonseca held Queshua out as an owner and seller of properties located in the Detroit, Michigan area.  Queshua merged into RBF Florida in May 2019.

28.     **Queshua 2** is a Florida limited liability company created by Fonseca in May 2017, with its principal place of business in Plantation, Florida.  From no later than May 2017 until at least May 2019, De Bastos and Fonseca owned or controlled this company.  De Bastos and Fonseca held Queshua 2 out as an owner and seller of properties located in the Detroit, Michigan area.  Queshua 2 merged into RBF Florida in May 2019.

29.     **Queshua 3** is a Florida limited liability company created by De Bastos in April 2018, with its principal place of business in Plantation, Florida.  From no later than April 2018 until at least May 2019, De Bastos and Fonseca owned or controlled this company.  De Bastos and Fonseca held Queshua 3 out as an owner and seller of properties located in the Detroit, Michigan area.  Queshua 3 merged into RBF Florida in May 2019.

30.     **Secure Invest LLC** ("Secure Invest"), is a Florida limited liability company created by De Bastos in April 2019, with its principal place of business in Plantation, Florida. From no later than April 2019 until at least December 2019, De Bastos owned or controlled this company.  De Bastos held Secure Invest out as a company that provided additional protection to investors concerning repairs, rent, and other things.

31. **Superhandymen LLC** ("Superhandymen"), is a Michigan limited liability company created in May 2016, with its registered office located in Okemos, Michigan. From no later than May 2016 until at least April 2019, De Bastos and Fonseca owned or controlled this company. De Bastos held Superhandymen out as a company providing repair services for homes.

32. **Vostok** is a Florida limited liability company created by Fonseca in February 2019, with its principal place of business in Plantation, Florida. From no later than February 2019 until at least May 2019, De Bastos and Fonseca owned or controlled this company. De Bastos and Fonseca held Vostok out as an owner and seller of properties located in the Detroit, Michigan area. Vostok merged with RBF Florida in May 2019.

## III. JURISDICTION AND VENUE

33. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

34. This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because, among other things, during the time of the violative conduct alleged herein, Defendant De Bastos resided in Plantation, Florida, RBF Florida and D3 Florida operated out of Plantation, Florida, and all Defendants transacted business or engaged in the violative conduct at issue in Plantation, Florida.

35. De Bastos is a Florida licensed real estate sales agent that, during the relevant period, operated and conducted business in Plantation, Florida, and managed or controlled companies from Plantation, Florida that are related to the offerings discussed herein, including RBF Florida, RBF Michigan, D3 Florida, and D3 Michigan. De Bastos, as an authorized

representative, entered into agreements with investors on behalf of D3 Gestion, and made material misrepresentations and omissions to investors and their agents in and from Plantation, Florida. Fonseca is the authorized representative of numerous Florida LLCs that operated and conducted business related to the offerings discussed herein and entered into the transactions at issue in this District. For example, Mariana Trench, Pre USA, Queshua, Queshua 2, Queshua 3 and others maintained their principal place of business and conducted business from Plantation, Florida. D3 Florida, D3 Michigan, RBF Florida, and RBF Michigan conducted business through De Bastos and Fonseca in Plantation, Florida, and RBF Florida, D3 Michigan, D3 Florida received investor funds that were wired into accounts held or controlled by De Bastos and Fonseca in Plantation, Florida. Defendant D3 Florida also received investor funds in Plantation, Florida. D3 Florida and/or D3 Michigan managed investor properties from Plantation, Florida.

36.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV. THE DEFENDANTS' FRAUDULENT UNREGISTERED OFFERING SCHEME

### A. The Defendants' Unregistered Securities Offering

37.     From no later than April 2016 until at least January 2020, De Bastos and Fonseca offered securities in the form of investment contracts to investors.

38.     During this same time period, De Bastos and Fonseca, directly and through D3 Gestion offered purported turnkey real estate investment opportunities to investors in the United States and overseas.

39.     Specifically, De Bastos, D3 Florida, and D3 Michigan offered investors the opportunity to invest in an enterprise whereby the Defendants would generate investment returns through the Defendants' expertise in real estate and their management and administrative roles.

40.     De Bastos, D3 Florida, and D3 Michigan offered investors investment contracts in the form of turnkey investment properties managed by De Bastos and D3 Gestion. Specifically, Defendants offered  investments in real properties located in Detroit, Michigan, which De Bastos and D3 Gestion would renovate and rent to tenants to generate  investment returns in the form of guaranteed rental income.

41.     De Bastos, directly and through D3 Gestion, told investors that this was a passive investment and that the Defendants would generate investment returns by: (1) assisting investors (if needed) in creating limited liability companies in which the investors would hold an ownership interest in the properties; (2) selling real properties owned by De Bastos and Fonseca to the limited liability companies through which the investors would obtain title to the properties; (3) renovating and repairing the properties; and (4) obtaining rental tenants for each renovated and repaired property and collecting rental income.

42.      In exchange for providing these services, D3 Michigan or D3 Florida was to receive 7.5% to 9% of the monthly rent the Defendants were able to collect on each property. Defendants also deducted from rental income other charges, including the monthly payment for the property (unless the purchase was an all-cash deal), property taxes, insurance, maintenance and other services. The balance of the rental income the Defendants generated was to go to the investors as their purported monthly investment return.

43.     The investors had no role in the investment other than contributing investment funds, wiring investor funds to the Defendants, and executing the investment contracts between

the investors and Defendants.  In fact, the vast majority of the owners of the limited liability companies that invested with De Bastos resided in France and had no interest or ability in managing their U.S. based investments.

44.     In fact, to lure investors, De Bastos, directly and through D3 Gestion, marketed the investment as a passive investment and guaranteed that De Bastos would use his real estate expertise and management experience to obtain specified rental income on each of the properties.

45.     In exchange for investor contributions, De Bastos executed investment contracts with each investor.  De Bastos also executed a written rental guarantee on behalf of D3 Gestion.

46.     De Bastos offered investors two methods of investing in the enterprise.

47.     The first option was that investors could invest with an all-cash deal whereby the investors would contribute cash to purchase real property the Defendants purportedly owned pursuant to an investment contract.

48.     Under this method of investing, the Defendants would transfer title of the real property to a limited liability company in which the investor held an ownership interest, and De Bastos, D3 Gestion would manage the property and generate investment returns by renovating the real property and renting it out to tenants for guaranteed rental income.

49.     The all-cash method of investment resulted in investors purchasing approximately 220 real properties between May 2016 and at least December 2019.

50.     The second method of investing was pursuant to a land contract for the purchase of real property De Bastos and Fonseca, directly or through their companies, purportedly owned.

51.     Under this method of investment, De Bastos' and Fonseca's companies financed the purchase of the real property through entities De Bastos and Fonseca owned or controlled.

52.     Investors choosing to finance their investment provided a down payment of approximately 50-60% of the purchase price and paid the balance over a five-year period, with typically 8% interest accruing to the Defendants as the purported sellers of the property.

53.     Pursuant to the finance method of investing, investors executed contracts with the Defendants promising to maintain insurance in the name of the selling company, which Defendants owned.

54.     The contracts further provided the investors could not damage the properties or sell them without the written approval of the Defendants' company that had sold the property to the investors.

55.     Investors purchased approximately 700 properties using the finance method of investment.

56.     De Bastos and D3 Gestion offered investors two options for receiving their investment returns – namely, through either (1) direct deposit payments in U.S. bank accounts that De Bastos and D3 Gestion opened on behalf of investors; or (2) international debit cards De Bastos and D3 Gestion would provide to the investors.

57.     From no later than April 2016 until at least January 2020, the Defendants raised more than $40 million from at least 250 investors in the United States and France through the Defendants' unregistered securities offering.

58.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities Defendants offered and sold, and no exemption from registration existed with respect to these securities.

**B. The Defendants' General Solicitation of Investors**

59. During the relevant period, De Bastos and Fonseca used general solicitation methods to promote their investment opportunities by communicating with potential investors in the United States and overseas by telephone, email, and the internet.

60. During the relevant period, De Bastos employed a team to assist him with communicating with potential investors. This team attended meetings with De Bastos, the investors or their representatives; participated in touring the properties with De Bastos, investors or their representatives; confirmed the prices, volume of properties, the ease of renting the properties, and gave assurances that the investments would be successful; replied to investor emails; and assisted with managing the properties, including managing repairs and collection and payment of rent; among other things. One member of the team communicated with investors' representatives on a weekly basis.

61. De Bastos also utilized at least two websites to promote his real estate investment opportunities, www.pre-international.com and www.detroit-gestion-immobiliere.com.

62. From at least May 2016 until at least July 2019, De Bastos also solicited investors through the use of at least one strategic partner, paying this partner commissions from amounts raised from each investor.

63. During the term of the offerings, the Defendants provided investors or their representatives with investment information, typically in the form of a property marketing brochure. The marketing brochures contained, among other things, pictures, descriptions and addresses of the properties, amount of rent and taxes, the property management fee, and the amount of expected monthly profits. Defendants at least emailed or gave this information to investors or their representatives during meetings Defendants had with investors or their representatives.

Defendants also placed similar information about properties available in the Detroit area on their website.

64. De Bastos and his team also provided investors other offering documents, including offers to purchase, land contracts, assignments of interests in land contracts, memoranda of land contracts, warranty deeds, powers of attorney, rental guarantees, closing documents, among others. De Bastos and his team at least used the internet to provide these documents, often times providing internet links to investors so they could access and sign the relevant documents.

### C. The Defendants' Material Misrepresentations and Omissions to Investors

#### *(1) False Claims that De Bastos or Fonseca Owned or Controlled the Properties*

65. From at least as early as September 2016 until at least January 2020, De Bastos and Fonseca falsely represented to investors that they, directly or indirectly, owned or controlled the real property at issue in the Defendants' investment offering.

66. Specifically, De Bastos told investors that his companies owned (or were acquiring) the properties being offered to investors in the investment offering. Fonseca represented to potential investors in land contracts that Related Entities RBF, Queshua, Queshua 2, Queshua 3, Mariana Trench, Patrimoine, Bishop Rock, Vostok, and Himalayan owned or had the right to own the properties offered to investors, and were the purported sellers of the properties at issue in the investment.

67. These representations were materially false. In truth, neither the Defendants nor the Related Entities owned most of the real property at issue in the investment offerings.

68. To conceal the discovery of the fraud by investors and others, De Bastos and Fonseca signed and recorded fraudulent documents with Wayne County, Michigan Register of Deeds.

69. Fonseca and De Bastos, directly or through the team De Bastos had hired, presented the investors with a series of pre-filled agreements that purported to set out the purchase and management of the property or properties (collectively, the "Agreements"). Depending on the structure of the investment (all cash or financing), Defendants provided:

a. An Offer to Purchase Real Estate, setting forth the description of the property, the price, and terms of sale. Fonseca signed the Offer to Purchase Real Estate on behalf of the purported sellers (i.e., RBF, Queshua, Queshua 2, etc.), while De Bastos signed as the "attorney in fact" for the purchaser/investor.

b. A Land Contract or Purchase Contract, memorializing the actual sale. Fonseca signed on behalf of the sellers and Defendant De Bastos signed as the purported "attorney in fact" for the purchaser.

c. A Special Warranty Deed for the property, signed by Fonseca on behalf of the purported seller and often times notarized by De Bastos' wife.

d. For land contracts, a Memorandum of Land Contract, signed by Fonseca as manager of the seller and typically notarized by De Bastos' wife, which Fonseca and De Bastos claimed would be recorded in the Wayne County, Michigan property records.

e. A Specific Power of Attorney given to investors by Defendants and their team that granted power of attorney to D3 Gestion for purposes of managing the property, entering into lease agreements, repairing or renovating the property, paying taxes on the property, among other things.

f. An Attestation of Rent Payment whereby D3 Gestion guaranteed a specified monthly rental income for each property for a specified period. De Bastos signed the Attestation of Rent Payment as authorized representative of D3 Gestion.

70. The Agreements contained material misrepresentations and omissions.

***a. Investor A.V. and Saint Gery LLC***

71. For example, on October 6, 2017, an entity called Saint Gery LLC was formed for purposes of having an investor with initials "A.V." who resided in France invest in the Defendants' offering.

72. On or around October 24, 2017, De Bastos and Fonseca provided A.V. with the governing Agreements via an internet cloud platform.

73. In the Agreements, De Bastos and Fonseca represented Saint Gery LLC would invest the proceeds related to the following six properties, which the Agreements stated were owned by Queshua 2:

a. 15302 Young Detroit, MI 48205

b. 8681 Artesion Detroit, MI 48228

c. 2251 La Belle Detroit, MI 48238

d. 19171 Cliff Detroit, MI 48234

e. 15885 Lindsay Detroit, MI 48227

f. 15878 Faircrest Detroit, MI 48205

74. Fonseca executed the Agreements on behalf of Queshua 2, the purported seller of the properties, and De Bastos signed the Agreements as attorney-in-fact for the purchaser/investor.

75. Prior to the investment, De Bastos told A.V. or A.V.'s representatives that the properties had paying tenants with the rental amount set and guaranteed at $850 per month per property, that De Bastos and D3 Michigan would manage the properties for the entire 5 year period of the land contract; and that Queshua 2 owned or would own the properties by the time of closing.

76.     De Bastos, D3 Gestion, and their team also provided Saint Gery LLC with a power of attorney.  Pursuant to the Power of Attorney form for this investment, investor A.V., through Saint Gery LLC, granted D3 Gestion, among other things, the exclusive right to lease the properties; the power to enter into leases and contracts on behalf of the investor; the power to manage tenant relations, including collecting and disbursing rent; the power to make repairs to the properties; and the power to act as property manager for a fee not to exceed 9% of gross amount of the rent.

77.     Pursuant to the terms of the Agreements, the total purchase price for the six properties was $311,700, with A.V., through Saint Gery LLC, providing $174,552 as a deposit and paying the balance over 5 years with 8% interest accruing to Queshua 2 as the purported seller of the properties.

78.     On October 24, 2017, A.V., on behalf of Saint Gery LLC, executed the Agreements.

79.     A.V. wired $174,552 to a Bank of America account located in Plantation, Florida that was controlled by De Bastos, held in the name of RBF Trust LLC, and for the benefit of Saint Gery LLC's investment.

80.     Contrary to the Defendants' representations made in the Agreements, Queshua 2 did not own the six properties at issue in this investment.

81.     On January 3, 2018, De Bastos and Fonseca caused the memorandum of land contracts to be recorded with the Register of Deeds in Wayne County, Michigan.

82.     To conceal the fact that Queshua 2 did not own the properties purportedly at issue in the Saint Gery LLC investment, on March 1, 2019 and June 18, 2019, Fonseca recorded affidavits of scrivener's errors in the Wayne County, Michigan Register of Deeds stating the

inclusion of the properties sold to Saint Gery LLC was the result of a scrivener's error and should not have been included in the land contract.

83. Defendant Fonseca signed four of the affidavits of scrivener's error on August 2, 2018, and the remaining two affidavits of scrivener's error on June 10, 2019. The affidavits were notarized in Broward County, Florida.

84. Defendants did not provide copies of the affidavits of scrivener's error to A.V. or Saint Gery LLC. Nor did the Defendants communicate to A.V. or Saint Gery LLC that De Bastos and Fonseca had filed the affidavits of scrivener's error for the properties in which A.V. had invested through Saint Gery LLC.

85. The Defendants repeated these same types of material misrepresentations and omissions, and continued this same scheme until at least January, 2020.

***b. Investor S.R. and Rogge and Co. LLC***

86. On or about January 2, 2018, an entity called Rogge and Co. LLC was formed for purposes of an investor with the initials S.R. residing in France to invest in the Defendants' offering.

87. On or around January 16, 2018, De Bastos and Fonseca provided S.R. via an internet cloud platform with the governing Agreements representing that S.R. through Rogge and Co. LLC was investing in two properties owned by Queshua 2:

a. 13939 Asbury Park Detroit, MI 48227

b. 8346 W. Outer Drive Detroit, MI 48219

88. De Bastos, D3 Gestion, and their team also provided Rogge and Co. LLC with a power of attorney. The Rogge and Co. LLC Power of Attorney gave D3 Gestion, among other things, the exclusive right to lease the properties; the power to enter into leases and contracts on

behalf of the investor; the power to manage tenant relations, including collecting and disbursing rent; the power to make repairs to the properties; and the power to act as property manager for a fee not to exceed 9% of gross amount of the rent.

89.      Pursuant to the terms of the Agreements, the total purchase price was $90,000, with S.R., through Rogge and Co. LLC, paying Defendants $50,400 at the time of the investment with the balance to be paid over 5 years with 8% interest accruing to Queshua 2 as the purported seller of the properties.

90.      On or about January 16, 2018, Fonseca signed the Agreements as manager of Queshua 2, S.R. signed the agreements as managing member of Rogge and Co. LLC., and De Bastos signed the Agreements as attorney-in-fact.

91.      On February 2, 2018, $50,400 was wired to a JPMorgan Chase account in the name of RBF Trust LLC and located in Plantation, Florida for the benefit of Rogge and Co. LLC's investment.

92.      Prior to the time of the investment, De Bastos told S.R. that the two properties at issue had paying tenants with the rental amount set and guaranteed at $850 per month per property; that De Bastos and D3 Michigan would manage the properties for the entire 5 year period of the land contract; and that Queshua 2 owned or would own the properties by the time of closing.

93.      Contrary to the representations the Defendants made in the Agreements, Queshua 2 did not own the two properties the Agreements purportedly conveyed to Rogge and Co. LLC.

94.      On July 25, 2018, De Bastos and Fonseca caused the memorandum of land contract to be recorded in Wayne County, Michigan.

95. On or about August 14, 2018, Fonseca recorded with the Wayne County, Michigan Register of Deeds discharges of land contracts concerning the properties that Queshua 2 had purportedly conveyed to Rogge and Co. LLC.

96. On March 1, 2019, Fonseca, on behalf of Queshua 2, recorded affidavits of scrivener's errors in the Wayne County, Michigan Register of Deeds, stating the inclusion of the properties purportedly sold to Rogge and Co. LLC was the result of a scrivener's error and should not have been included in the land contract.

97. Fonseca signed the affidavits of scrivener's error and the affidavits were notarized in Broward County, Florida.

98. Defendants did not provide copies of the affidavits of scrivener's error or the discharge of land contract to S.R. or Rogge and Co. LLC. Nor did the Defendants communicate to S.R. or Rogge and Co. LLC that Defendants had filed the affidavits of scrivener's error and the discharges of land contracts for the properties in which S.R. had invested.

***c. Investor C.B. and Butterfly Eldorado LLC***

99. On March 15, 2018, Butterfly Eldorado LLC was created for purposes of an investor with the initials C.B. residing in France to invest in the Defendants' offering.

100. On or around March 21, 2018, De Bastos and Fonseca provided C.B. with the governing Agreements representing that C.B. through Butterfly Eldorado LLC was investing in two properties owned by Queshua 2:

a. 12892 Asbury Park Detroit, MI 48227

b. 12679 Grandmont Detroit, MI 48227

101. De Bastos, D3 Gestion, and their team also provided Butterfly Eldorado LLC with a power of attorney. The Butterfly Eldorado LLC Power of Attorney gave D3 Gestion among

other things, the exclusive right to lease the properties; the power to enter into leases and contracts on behalf of the investor; the power to manage tenant relations, including collecting and disbursing rent; the power to make repairs to the properties; and the power to act as property manager for a fee not to exceed 9% of gross amount of the rent.

102.    Pursuant to the terms of the Agreements, the total investment amount was $105,900, with C.B., on behalf of Butterfly Eldorado, paying $61,422 to Defendants at the time of the investment and the balance over the course of 5 years with 8% interest accruing to Queshua 2.

103.    On approximately March 21, 2018, C.B., on behalf of Butterfly Eldorado LLC, signed the Agreements as managing member of Butterfly Eldordado LLC, and De Bastos signed the Agreements as attorney-in-fact. Fonseca signed the Agreements as manager of Queshua 2.

104.    On March 23, 2018, CB wired $61,422 to a TD Bank account in the name of RBF Trust LLC, located in Plantation, Florida, for the benefit of Butterfly Eldorado LLC's investment.

105.    Prior to the investment, De Bastos told C.B. or C.B.'s representatives that the properties had paying tenants with the rental amount set and guaranteed at $850 per month per property, that De Bastos and D3 MI would manage the properties for the entire 5 year period of the land contract; and that Queshua 2 owned or would own the properties by the time of closing.

106.    Contrary to the Defendants' representations to C.B., Queshua 2 did not own the two properties purportedly conveyed to Butterfly Eldorado LLC.

107.    De Bastos and Fonseca recorded the memorandum of land contract with Wayne County, Michigan Register of Deeds on November 19, 2018.

108.    On or about December 3, 2018, De Bastos and/or Fonseca, on behalf of Queshua 2, recorded discharges of memoranda of land contracts concerning the properties Queshua 2 conveyed to Butterfly Eldorado LLC.

109. On February 28, 2019, De Bastos and Fonseca, on behalf of Queshua 2, recorded affidavits of scrivener's errors with the Wayne County, Michigan Register of Deeds stating the inclusion of the properties sold to Butterfly Eldorado LLC was the result of a scrivener's error and should not have been included in the land contract.

110. Fonseca signed the affidavits of scrivener's error and the affidavits were notarized in Broward County, Florida.

111. Defendants did not provide copies of the affidavits of scrivener's error or the discharge of land contract to C.B. or Butterfly Eldorado LLC. Nor did Defendants communicate to C.B. or Butterfly Eldorado LLC that Fonseca had filed the affidavits of scrivener's error and the discharges of land contracts for the properties in which C.B. had invested.

***d. Investor F.J. and Fred and Lou LLC***

112. On April 11, 2018, Fred and Lou LLC was created for purposes of an investor with the initials F.J. residing in France to invest in the Defendants' offering.

113. De Bastos and Fonseca packaged two properties together for F.J. to invest through Fred and Lou LLC.

114. De Bastos and Fonseca provided F.J. with the governing Agreements representing that F.J. through Fred and Lou LLC was investing in the following two properties owned by Queshua 2:

a. 9984 Patton Detroit, MI 48228

b. 18918 Waltham Detroit, MI 48205

115. De Bastos, D3 Gestion, and their team also provided Fred and Lou LLC with a power of attorney. The Fred and Lou LLC power of attorney gave D3 Gestion, among other things, the exclusive right to lease the properties; the power to enter into leases and contracts on behalf of

the investor; the power to manage tenant relations, including collecting and disbursing rent; the power to make repairs to the properties; and the power to act as property manager for a fee not to exceed 9% of gross amount of the rent.

116.    Pursuant to the terms of the agreements, the total purchase price was $105,900.  The land contract required a $61,422 deposit with the balance to be paid off over 5 years with 8% interest accruing to Queshua 2.

117.    On or about April 23, 2018, Fonseca signed the agreements as manager of Queshua 2.  F.J. signed the agreements as managing member of Fred and Lou LLC.  De Bastos signed the agreements as attorney-in-fact.

118.    On April 26, 2018, F.J. wired $62,000 to a TD Bank account in the name of RBF Trust LLC and located in Plantation, Florida, for the benefit of Fred and Lou LLC's investment.

119.    Prior to the investment, De Bastos and Fonseca represented to F.J., among other things, that the properties had paying tenants with the rental amount set and guaranteed at $850 per month per property; Defendants De Bastos and D3 Michigan would manage the properties for the entire 5 year period of the land contract; and that Queshua 2 owned or would own the properties by the time of closing.

120.    Contrary to the Defendants' representations to F.J., at the time of closing and thereafter, neither Defendants nor Queshua 2 owned the properties they conveyed to Fred and Lou LLC.

121.    De Bastos and Fonseca recorded the memorandum of land contract on July 25, 2018 with the Wayne County Register of Deeds.

122.    On or about August 14, 2018, Defendant Fonseca, on behalf of Queshua 2, recorded a discharge of memorandum of land contract concerning the property located at 9984 Patton

Detroit, MI 48228 and previously conveyed by Queshua 2 to Fred and Lou LLC in the Wayne County, Michigan Register of Deeds.

123. On or about February 28, 2019, more than 10 months after Queshua 2 sold the properties to Fred and Lou LLC, Fonseca, on behalf of Queshua 2, recorded affidavits of scrivener's errors in the Wayne County, Michigan Register of Deeds stating the inclusion of the properties sold to Fred and Lou LLC was the result of a scrivener's error and should not have been included in the land contract. Defendant Fonseca signed the affidavits of scrivener's error and the affidavits were notarized in Broward County, Florida.

124. Defendants did not provide copies of the affidavits of scrivener's error or the discharge of memorandum of land contract to Fred and Lou LLC. Nor did Defendants communicate to Fred and Lou LLC that Defendants had filed the affidavits of scrivener's error and the discharge of memorandum of land contract for the properties Fred and Lou LLC had contracted to purchase.

***e. Investor S.R. and Capital Gain US 5 LLC***

125. On February 1, 2018, Capital Gain US 5 LLC was created for purposes of an investor with the initials S.R. residing in France to invest in the Defendants' offering.

126. De Bastos and Fonseca packaged eleven properties together for Capital Gain US 5 LLC to invest.

127. De Bastos and Fonseca provided S.R. with the governing Agreements representing that S.R. through Capital Gain US 5 LLC Investments was investing in the following eleven properties owned by Queshua 3:

a. 9460 Wayburn Detroit, MI 48224

b. 11427 Wayburn Detroit, MI 48224

     c.      11675 Wayburn Detroit, MI 48224

     d.      10520 Roxbury Detroit, MI 48224

     e.      10431 Roxbury Detroit, MI 48224

     f.      10382 Roxbury Detroit, MI 48224

     g.      10335 Roxbury Detroit, MI 48224

     h.      10311 Roxbury Detroit, MI 48224

     i.      10445 Nottingham Rd. Detroit, MI 48224

     j.      10043 McKinney Detroit, MI 48224

     k.      9368 Heyden Detroit, MI 48228

128.    De Bastos, D3 Gestion, and their team also provided Capital Gain US 5 LLC with a power of attorney.  The Capital Gain US 5 LLC power of attorney gave D3 Gestion, among other things, the exclusive right to lease the properties; the power to enter into leases and contracts on behalf of the investor; the power to manage tenant relations, including collecting and disbursing rent; the power to make repairs to the properties; and the power to act as property manager for a fee of 9% of the gross amount of the rent for each property.

129.    Pursuant to the terms of the agreements, the total purchase price was $549,450.  The land contract required a $318,681 deposit with the balance to be paid off over 5 years with 8% interest accruing to Queshua 3.

130.    On or about April 27, 2018, Fonseca signed the agreements as manager of Queshua 3.  S.R. signed the agreements as managing member of Capital Gain US 5 LLC.  Defendant De Bastos signed the agreements as attorney-in-fact.

131.    On April 27, 2018, Capital Gain US 5 LLC wired $318,681 to a TD Bank account in the name of RBF Trust LLC, located in Plantation, Florida, for the benefit of S.R. and Capital Gain US 5 LLC's investment.

132.    Prior to the investment, De Bastos and Fonseca represented to S.R., among other things, that the properties had paying tenants with the rental amount set and guaranteed at $850 per month per property; Defendants De Bastos and D3 Michigan would manage the properties for the entire 5 year period of the land contract; and that Queshua 3 owned or would own the properties by the time of closing.

133.    Contrary to these representations, at the time of closing and thereafter, neither Defendants nor Queshua 3 owned the properties they conveyed to Capital Gain US 5 LLC.

134.    De Bastos and Fonseca and their team recorded the memorandum of land contract on July 25, 2018 in the Wayne County, Michigan Register of Deeds.

135.    In August and October 2018, Defendant Fonseca recorded multiple discharges of memorandum of land contracts concerning the properties previously conveyed by Queshua 3 to Capital Gain US 5 LLC.

136.    On June 18, 2019, more than a year after Queshua 3 sold the properties to Capital Gain US 5 LLC, Fonseca recorded affidavits of scrivener's errors in the Wayne County, Michigan Register of Deeds stating the inclusion of the properties sold to Capital Gain US 5 LLC was the result of a scrivener's error and should not have been included in the land contract.  Fonseca signed the affidavits of scrivener's error and the affidavits were notarized in Broward County, Florida.

137.    Defendants did not provide copies of the affidavits of scrivener's error or the discharges of memorandum of land contract to Capital Gain US 5 LLC.  Nor did Defendants communicate to Capital Gain US 5 LLC that Defendants had filed the affidavits of scrivener's

error and the discharges of memorandum of land contract for the properties Capital Gain US 5 LLC had contracted to purchase.

138. Ultimately and based on Defendants' misrepresentations and omissions described above, Capital Gain US 5 LLC entered into agreements for the purchase and management of 43 properties. In total, Capital Gain US 5 LLC paid more than $2.1 million to Defendants for the purchase of the properties and associated fees only to learn later that Defendants and their companies did not own the properties sold to Capital Gain US 5 LLC.

***f. Investor R.W. and Alkylo LLC***

139. On or about March 29, 2019, Alkylo LLC was formed for the purpose of an investor with initials R.W. residing in France to invest in the Defendants' offering.

140. De Bastos and Fonseca provided R.W. with the governing agreements representing that R.W. through Alkylo LLC was investing in the following property from Bishop Rock via a land contract:

a. 9723 Lakepointe Detroit, MI 48224

141. De Bastos, D3 Gestion, and their team also provided Alkylo LLC with a power of attorney. The Alkylo LLC form power of attorney gave D3 Gestion, among other things, the exclusive right to lease the properties; the power to enter into leases and contracts on behalf of the investor; the power to manage tenant relations, including collecting and disbursing rent; the power to make repairs to the properties; and the power to act as property manager for a fee not to exceed 9% of gross amount of the rent.

142. Pursuant to the terms of the agreements, the total purchase price was $56,950. The land contract required a $34,170 deposit with the balance to be paid off over 5 years with 8% interest accruing to Bishop Rock.

143. On or about April 11, 2019, Fonseca signed the agreements as manager of Bishop Rock. R.W. signed the agreements as managing member of Alkylo LLC. De Bastos signed the agreements as attorney-in-fact.

144. On June 18, 2019, R.W. wired $34,170 to a Regions Bank account in the name of RBF Trust LLC, located in Plantation, Florida for the benefit of Alkylo LLC's investment.

145. Prior to the investment, De Bastos and Fonseca represented to R.W. or his representatives, among other things, that the properties had paying tenants with the rental amount set and guaranteed at $850 per month per property; Defendants De Bastos and D3 Michigan would manage the properties for the entire 5 year period of the land contract; and that Bishop Rock owned or would own the properties by the time of closing.

146. Contrary to these representations, at the time of closing and thereafter, neither Defendants nor Bishop Rock owned the property they conveyed to Alkylo LLC.

147. De Bastos, Fonseca and their team recorded the memorandum of land contract on December 16, 2019.

148. In the couple of months following the Individual Defendants' recordation of the Alkylo LLC land contract, Alkylo LLC learned that Defendants did not own the property Alkylo LLC had contracted to purchase.

***(2) Material Misrepresentations about the Profitability of the Investment Properties and Defendants' Expertise in Real Estate and Property Management***

149. In addition to falsely telling investors that Defendants directly, or through companies they owned or controlled, owned the properties they were selling and had the authority to convey clear title to investors, Defendants also made misrepresentations about the condition and profitability of the properties.

150.    Defendants D3 Gestion and De Bastos told prospective investors that the properties were in good repair and had existing, paying tenants.  They also guaranteed rental income from paying tenants, guaranteed the amount of rent, guaranteed investors would not have maintenance costs for specified periods, and represented they would completely manage the properties for the investors, including paying taxes as they became due from the rent collected.

151.    These representations were false.  In truth, De Bastos and D3 Gestion failed to manage the investments as promised, including but not limited to failing to renovate properties, obtain paying tenants, pay all the rent to investors as guaranteed and promised, and paying all taxes due on the properties. As a result, many of the properties were in disrepair and did not have paying tenants.

152.    De Bastos touted his expertise and reputation for excellence in the Detroit real estate market and high volume of clients.

153.    While touting his purported expertise in the real estate market, De Bastos failed to disclose that he and Fonseca had previously been sanctioned by the Business Court of Paris, which ordered the liquidation of their real estate company and prohibited them from managing companies and other commercial activities for a period of 5 years after they, among other things, disposed of corporate property as their own.

154.    Nor did De Bastos disclose that he had been ordered to cease-and-desist by the North Dakota Securities Department for, among other things, offering and selling unregistered securities, making material misrepresentations and omissions in connection therewith, and acting as an unregistered broker-dealer in North Dakota.

### *(3) Material Misrepresentations about the Use of Investor Proceeds*

155. Defendants told prospective investors that their investment proceeds would be used to purchase the property and pay for the leasing and management services provided by De Bastos and D3 Gestion. However, Defendants De Bastos and Fonseca misappropriated a portion of investor funds for themselves, and transferred investor funds to family members, and entities controlled by De Bastos and/or Fonseca.

156. In addition, Defendants used investor funds in a Ponzi-like fashion by paying investors the purported rental payments that far exceeded the rental payments actually received. as described further below.

## D. The Defendants' Efforts to Conceal the Fraud

157. Although De Bastos and Fonseca recorded affidavits of scrivener's error concerning hundreds of properties sold by land contract, Defendants paid and continued paying purported rent to investors after they had recorded the affidavits of scrivener's errors.

158. Defendants' payment of purported rent to investors continued until January 2020, despite Defendants' and their companies' lack of ownership of most of the properties sold to investors and despite that many properties were unoccupied or occupied by squatters and in disrepair.

159. Defendants' payment of rent to investors exceeded the rental income Defendants collected from tenants. As a result, a portion of the rent paid to investors did not come from paying tenants, but rather came from proceeds from new investments.

160. As mid-January 2020 approached, and facing an impending audit by investors S.R. and Capital Gain US 5 LLC, or their representatives, Defendants stopped making rent payments, emptied investor funds from the U.S. bank accounts formed by investors and investors' PEX card

accounts, removed investors' access to Defendants' property management software platform, and stopped communicating with investors.

161. Since that time, Defendants have not provided rental income to investors, returned the funds taken from the investors' accounts, or provided investors with title to the properties investors thought they had purchased.

## V. CLAIMS FOR RELIEF

### COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

### Against De Bastos and Fonseca

162. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

163. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by the Individual Defendants as described in this Complaint, and no exemption from registration existed with respect to these securities.

164. From approximately April 2016 until at least January 2020, De Bastos and Fonseca, directly and indirectly:

a. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

b. carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

165. By reason of the foregoing, De Bastos and Fonseca, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77e(c)].

## COUNT II

## Violations of Section 17(a)(1) of the Securities Act

## Against All Defendants

166. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

167. From approximately April 2016 until at least January 2020, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

168. By reason of the foregoing, the Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## COUNT III

## Violations of Section 17(a)(2) of the Securities Act

## Against All Defendants

169. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

170. From approximately April 2016 until at least January 2020, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts

necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

171. By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

**COUNT IV**

**Violations of Section 17(a)(3) of the Securities Act**

**Against All Defendants**

172. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

173. From approximately April 2016 until at least January 2020, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

174. By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(3)].

**COUNT V**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)**

**Against All Defendants**

175. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

176. From approximately April 2016 until at least January 2020, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails,

knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

177. By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) [17 C.F.R. §240.10b-5(a)] thereunder.

**COUNT VI**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**Against All Defendants**

178. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

179. From approximately April 2016 until at least January 2020, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

180. By reason of the foregoing, the Defendants, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)] thereunder.

**COUNT VII**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)**

**Against All Defendants**

181. The Commission repeats and reallegs Paragraphs 1 through 161 of its Complaint.

182. From approximately April 2016 until at least January 2020, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in

connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

183. By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S/.C. §78j(b)] and Rule 10b-5(c) [17 C.F.R. §240.10b-5(c)] thereunder.

**COUNT VIII**

**Violations of Section 15(a)(1) of the Exchange Act**

**Against De Bastos**

184. The Commission repeats and realleges Paragraphs 1 through 161 of its Complaint.

185. From approximately April 2016 until at least January 2020, Defendant De Bastos, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with any entity registered with the Commission as a broker-dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

186. By reason of the foregoing, De Bastos, directly and indirectly, violated, and unless enjoined, is reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## VI. RELIEF REQUESTED

The Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

**A. <u>Permanent Injunction</u>**

Issue a Permanent Injunction enjoining Defendants, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder; further enjoining De Bastos and Fonseca from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77e(c)]; and enjoining Defendant De Bastos from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**B. <u>Disgorgement and Prejudgment Interest</u>**

Issue an Order directing Defendants to disgorge all ill-gotten gains or proceeds received, with prejudgment interest thereon, resulting from the acts and/or courses of conduct complained of herein.

**C. <u>Civil Monetary Penalties</u>**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

**D. <u>Officer and Director Bar Against Defendants De Bastos and Fonseca</u>**

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], permanently prohibiting De Bastos and Fonseca from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

**E. Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**F. Retention of Jurisdiction**

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VII. DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: September 29, 2022 Respectfully submitted,

By: s/Amie Riggle Berlin
**Amie Riggle Berlin, Esq.**
Senior Trial Counsel
Bar No. 630020
Direct Dial: (305) 982-6322
Email: berlina@sec.gov

**ATTORNEY FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

Of counsel:
John T. Houchin, Esq.
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131